**Denita DONAHOO, Plaintiff,**

v.

**MASTER DATA CENTER, Defendant.**

**No. 02–73675.**

United States District Court,
E.D. Michigan.
Southern Division.

July 29, 2003.

Herbert A. Sanders, Sanders & Johnson, Detroit, MI, for Plaintiff.

Daniel D. Swanson, Sommers, Schwartz, Southfield, MI, for Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

EDMUNDS, District Judge.

The matter came before the Court on Defendant's motion for summary judgment. Plaintiff filed suit against Defendant, her employer, claiming that Defendant violated her rights under the Family and Medical Leave Act ("FMLA") and the Michigan Persons with Disabilities Civil Rights Act ("PWDCRA"), unlawfully retaliated against her for asserting her rights under the PWDCRA, and intentionally inflicted emotional distress upon her. For the reasons fully explained below, the Court should GRANT Defendant's motion because Plaintiff cannot establish that she is disabled under the PWDCRA; when she returned from her medical leave she did not return from a FMLA leave and therefore was not entitled to its protections; and she cannot show that Defendant's conduct was extreme or outrageous enough to constitute the tort of intentional infliction of emotion distress.

### I. Facts

Plaintiff, Denita Donahoo, began working for Defendant, Master Data Center ("MDC"), as a programmer/analyst in May of 2000.[1] (Pl.Ex. A.) Defendant is in the business of developing software to track annuity payments for its clients' trademarks and patents. (Pl. Dep. at 33.) Ms. Donahoo wrote conversion programs for Defendant's clients, and at the time of her accident, her title was Conversion Programmer.

On June 29, 2001, Ms. Donahoo injured her right foot, leg, shoulder, and elbow in a car accident. *Id.* at 17–18. She was driving with her fiancé near Northland Mall when her car collided with another. *Id.* at 14. Both drivers pulled over in the Northland Mall parking lot, and Ms. Donahoo exited her car and approached the other car to exchange insurance information. *Id.* at 15. As she attempted to hand the other driver her information through the other car's open window, the other driver rolled up the window and drove away, dragging Ms. Donahoo down the street. *Id.* Ms. Donahoo broke her right foot, lost mobility in her right arm and shoulder, and had open injuries to her elbow, hands, foot, and leg. *Id.* at 17–18.

In total, Ms. Donahoo was off of work from the date of the accident until December 24, 2001, with the exception of two days she worked in July. (Pl.Ex. J.) Ms. Donahoo avers that MDC "denied me FMLA leave and instead place me on 'other' leave, effective July 1, 2001." (Donahoo Aff. ¶ 6.) Her statement implies, but does not expressly state, that she requested an FMLA leave.

On July 20, 2001, Ms. Donahoo requested a meeting with Mr. Salvatore Caruso, MDC's business manager, to discuss a personal matter. (Caruso Aff. ¶ 5.) At that meeting, Ms. Donahoo told Mr. Caruso that she needed a favor. *Id.* She was in the process of buying a new house, but did not want to close on the purchase. *Id.* She

---

1. Ms. Donahoo claimed in her deposition and in her resume that she earned a bachelor of science degree from DeVry Institute of Technology, but the DeVry registrar has sent Defendant a letter stating that she does not hold any degree, and that while she was enrolled at the school for a period of time she never completed any degree program.

informed Mr. Caruso that the only way she could avoid closing on the new home was for MDC to place her on an undetermined leave of absence. *Id.* Mr. Caruso responded that he could not do so because her most current doctor's note specified that her anticipated return to work date was July 24, 2001. *Id.*

MDC then requested and obtained a second opinion regarding Ms. Donahoo ability to work from Dr. Roland Brandt. (Caruso Aff. ¶ 6.) At her consultation with Dr. Brandt on August 15, 2001, he found that the problems with her right shoulder were still "unresolved." (Pl.Ex. C.) He issued work restrictions, which consisted of avoiding use of the right arm above shoulder level, avoiding forceful use, and avoiding lifting anything over two pounds with the right upper extremity. He also stated, "She describes her position as working on a computer keyboard and it is my opinion that she could do this job. She may have some discomfort which progresses through the day and she may need to take a break occasionally, but she should be functional at desktop level. It may be helpful to adjust her chair height or desk height to accommodate any discomfort that she does develop in her shoulder." *Id.*

Following Mr. Caruso's receipt of Dr. Brandt's opinion, Mr. Caruso called Ms. Donahoo and they agreed she would return to work on August 27, 2001. (Caruso Aff. ¶ 7.) Ms. Donahoo did report for work on the morning of August 27, but when Mr. Caruso returned from lunch, he found a note from Ms. Donahoo's doctor, Dr. Ross, indicating that she was physically unable to work as a conversion programmer. *Id.* at ¶ 8. Later that afternoon, Mr. Caruso met with Ms. Donahoo and presented her with two options, detailed in a written memo: (1) she could return to work, as of that day, in her current position of Conversion Programmer, or (2) she

could return to short-term disability effective immediately. If she chose the second option, the memo stated that "Master Data Center can only promise you a job with equivalent pay, benefits and other employment terms and conditions upon her [sic] return to work." *Id.* at ¶ 9; Def. Ex. D. The next morning, Ms. Donahoo left a voicemail message for Mr. Caruso indicating that she would not be at work. (Caruso Aff. ¶ 10.) Mr. Caruso immediately called Plaintiff and left her a message indicating that he understood from her message that she was returning to disability leave and that if he was mistaken, she should contact him immediately. *Id.* Ms. Donahoo did not respond to Mr. Caruso's message. *Id.*

Ms. Donahoo's latest doctor's note had allowed her to return to work on September 28, 2001. (Def.Ex. E.) By October 2, 2001, Ms. Donahoo had not reported for work and MDC had not received any communication from her. *Id.* Consequently, on October 2, 2001, Mr. Caruso sent her a notice of termination, which stated in part: "Company policy states that 'if you do not return from this leave as scheduled or obtain other employment while on leave, we will consider this to be job abandonment, which is a voluntary resignation without notice' ... If there are any extenuating circumstances I need to be aware of, or it you have any questions, place call me ...." *Id.*

On October 5, 2001, MDC received a certified letter from Ms. Donahoo, which included a doctor's note. (Def.Ex. F.) Mr. Caruso sent Ms. Donahoo a letter in response, which stated that MDC decided to rescind the termination letter, but that her employment was subject to two conditions: she must submit written status reports every two weeks detailing the progress of her rehabilitation and her anticipated date of return, and upon her return, MDC only

guaranteed her a job with equivalent pay, benefits, and other employment terms and conditions as the job she held before her leave. *Id.*

Upon Ms. Donahoo's return to work on December 24, 2001, her physician placed certain restrictions on her work, including requiring an ergonomic keyboard and chair, frequent breaks, and time off to attend physical therapy sessions. (Def.Ex. G.) Ms. Donahoo did not return to her former position as conversion programmer. (Pl. Dep. at 36.) Instead, she was reassigned to work as a receipt analyst. *Id.* While Ms. Donahoo felt the job was beneath her education, experience, and qualifications, she admits that she did not suffer any loss in pay or benefits by MDC reassigning her to the new position. *Id.* at 51–52.

Ms. Donahoo claims that MDC did not comply with her work restrictions by not providing her with an ergonomic keyboard and by not providing with the type of ergonomic chair that adjusted the way she needed it to adjust. *Id.* at 47. Also, the new position of receipt analyst changed Ms. Donahoo's work environment in several respects, which she claims made her medical problems more difficult to manage. As a receipt analyst, Ms. Donahoo was required to lift heavy files and bundles of receipts. Rather than MDC providing assistance proactively, Ms. Donahoo was required to find assistance every time she needed to lift or move the heavy files and receipts. *Id.* at 61. She was also required to work certain hours, while in her previous position she could "flex-time", and work from 7:00 a.m. to 3:00 p.m., for example, if she so chose. *Id.* at 50–53. Finally, her new position was basically a data entry position, requiring her to sit and type the entire day. *Id.* at 43–45. As a conversion programmer, she spent only fifty percent of her time typing, and spent the rest of her time interacting with other employees and clients. *Id.* at 44–46.

Ms. Donahoo requested that MDC return her to her previous position, but MDC denied her request. *Id.* at 37. MDC claims that her position was eliminated for business reasons—when Ms. Donahoo held the position, there were three conversion programmers, but since she left MDC made the business decision to only employ one conversion programmer. (Caruso Aff. ¶ 13.) Ms. Donahoo, however, believes that MDC hired another individual to fill Ms. Donahoo's former position, despite her request for the job. (Pl. Dep. at 58.)

In addition to claiming that MDC directly violated state and federal disability and medical leave statutes, Ms. Donahoo alleges that MDC retaliated against her on the basis of her disability. She lists the following acts as acts of retaliation:

(1) MDC changed her job from conversion programmer to the less skillful job of receipt analyst;

(2) MDC changed Ms. Donahoo's hours from flex-time to a set schedule;

(3) When Ms. Donahoo requested information, she only received verbal responses, never anything in writing via fax or email (Pl. Dep. at 53–54);

(4) Ms. Donahoo's supervisor would change her duties and requirements throughout the workday and week (Pl. Dep.82–83);

(5) MDC did not accommodate Ms. Donahoo's restrictions, as instructed by her physician;

(6) MDC would scrutinize Ms. Donahoo's work more harshly than other employees, including by methods such as: Mr. Caruso called Ms. Donahoo into his office up to four times a week (Pl.Dep.107–108); supervisors monitored her work

more closely than other employees, *id.* at 66–67; supervisors monitored her breaks more closely than other employees, *Id.*; and supervisors assigned her more work than other employees (no cite);

(7) her former superiors and co-workers in the programmer department stopped speaking to Ms. Donahoo, *Id.* at 110;

(8) Ms. Donahoo's former supervisor told her if she doesn't like it, quit, *Id.* at 76;

(9) MDC filled her former position with another person after Ms. Donahoo informed it that she wanted the job;

(10) Ms. Donahoo's supervisor would put stacks of receipts on her chair everyday, even though Ms. Donahoo repeatedly told her that she had trouble lifting off of her seat. *Id.* at 111.

Ms. Donahoo resigned on May 17, 2002. (Pl.Ex. H.) On September 13, 2002, Ms. Donahoo filed suit in this Court, alleging four claims: (1) MDC violated the Michigan Persons with Disabilities Civil Rights Act by failing to accommodate her disability; (2) MDC violated the Michigan Persons with Disabilities Civil Rights Act by retaliating against her for her opposing MDC's violation of the Act; (3) MDC's conduct constituted intention infliction of emotional distress; and (4) MDC violated the Family and Medical Leave Act of 1993 by not allowing her to return to her original job after she returned from her leave. Discovery is now complete, and MDC moves for summary judgment on all four of Ms. Donahoo's claims.

## II. Standard for Summary Judgment

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. 2548. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505.

The court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255, 106 S.Ct. 2505. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

## III. Analysis

Defendant argues for summary judgment on the following five grounds. First, Plaintiff has not suffered an adverse employment action and therefore she is not entitled to relief under the FMLA or the PWDCRA. Second, Plaintiff is not "disabled" within the meaning of the PWDCRA. Third, Defendant did not re-

taliate against her for exercising her rights under the PWDCRA or for taking a leave under the FMLA. Fourth, Plaintiff has no claim under the FMLA because she had exhausted her rights under that statute and when she returned to work, she returned from Defendant's short-term disability plan, not an FMLA leave. Finally, Defendant did not engage in any outrageous conduct to support her intentional infliction of emotional distress claim.

## A. PWDCRA Violations

■ Plaintiff must show the following three elements to establish a prima facie case of discrimination under the PWDCRA: "(1) she is 'disabled' as defined by the statute, (2) the disability is unrelated to the plaintiff's ability to perform the duties of a particular job, and (3) the plaintiff has been discriminated against in one of the ways set forth in the statute." *Chiles v. Machine Shop, Inc.*, 238 Mich.App. 462, 606 N.W.2d 398, 405 (1999).

■ For Plaintiff to succeed on either of her PWDCRA claims, she must have a disability within the meaning of the act. The statute defines a disability as

"(i) A determinable physical or mental characteristic of an individual which may result from disease, injury, congenital conditions of birth, or functional disorder, if the characteristic: (A) ... substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion."

Mich. Comp. Laws Ann. § 37.1103(d)(i)(A) (West 2001). Michigan has adopted the following three-step test, formulated by federal courts to analyze claims under the Americans with Disabilities Act ("ADA"), to determine whether a plaintiff has a disability:

First, we consider whether respondent's [complaint] was a physical impairment. Second, we identify the life activity upon which respondent relies ... and determine whether it constitutes a major life activity under the ADA. Third, tying the two statutory phrases together, we ask whether the impairment substantially limited the major life activity.

*Id.* at 406, quoting *Bragdon v. Abbott*, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).[2]

First, a shoulder injury is a physical impairment, and the parties do not dispute that element. Furthermore, Plaintiff has produced sufficient evidence, in the form of many doctor's notes and reports, that establish her shoulder injury. *See* Pl.Ex. C.

■ As to the second and third steps, Plaintiff must identify the major life activity which is limited. Michigan courts defined major life activities as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." *Stevens v. Inland Waters, Inc.*, 220 Mich.App. 212, 559 N.W.2d 61 (1996).

Plaintiff has identified the following activities as being substantially limited: lifting, performing repetitive processes, extensive walking, and sometimes household tasks. (Note: In her brief, she also claims she was unable to perform "numerous daily tasks" and had trouble moving around, but cites no evidence in support.)

■ As to Plaintiff's lifting restriction, Michigan courts recognize that "a lifting restriction constitutes a disability

---

**2.** Michigan courts recognize that the ADA and the PWDCRA "share the same purpose and use similar definitions and analyses, and both courts have relied on the ADA in interpreting the PWDCRA." *Chiles,* 606 N.W.2d at 405.

under the PWDCRA when it imposes substantial limitations on an individual's ability to perform the normal activities of daily living." *Lown v. JJ Eaton Place*, 598 N.W.2d 633, 639 (Mich.App.1999). The *Lown* court affirmed the trial court's grant of summary disposition to the defendant because even though the plaintiff was unable to lift objects over ten to fifteen pounds for two years, after that she was able to lift object up weighing up to twenty-five pounds. *Id.* The Michigan Court of Appeals held that a lifting restriction of twenty-five pounds is not a substantial limitation and did not establish that the plaintiff was disabled under the PWDCRA. *Id.* As to the ten to fifteen pound lifting restriction in place for two years, the court held that it did not substantially impair a major life activity for two reasons. First, temporary impairments are generally not disabilities. *Id.* While the line between a "temporary" impairment and a "disability" is not clear, "it is clear that the length of a 'temporary' impairment need not be brief." *Id.* In any event, the court reasoned that it did not need to determine if a two-year restriction was temporary because the only affected life activity for which Plaintiff presented evidence was her inability to bowl. *Id.* at 640.

In the case at hand, the Court need not decide if, generally, a five-pound lifting restriction is a substantial impairment because Plaintiff has not presented sufficient evidence for a factfinder to reasonably conclude that a nonwork major life activity that was substantially impaired by the lifting restriction. The only evidence is Plaintiff's own deposition testimony, when she states, "Some days I don't want to leave the house, some days I don't want to—I can't deal with the—I can't do some of the everyday things I used to that would entail extensive walking or I may be trying to do some house cleaning and have a problem doing that and it frustrates me." (Pl. Dep. at 22–23). Giving Plaintiff every benefit of the doubt, this evidence is insufficient to find that her lifting restriction (or other physical injury from the accident, for that matter) substantially impaired her ability to care for herself or do housework. She does not quantify how many manual tasks she is unable to perform, if all housework is impossible or just certain tasks, for instance.

■ Michigan courts follow the federal regulations for interpreting the ADA, and those guidelines require courts, after other major life activities are ruled out, to consider whether the major life activity of working is substantially impacted by the impairment. *Id.* at 640. For Plaintiff to show that she is substantially impaired in the major life activity of working, she must show that she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." 29 C.F.R. 1630.2(j)(3)(i). The Michigan Court of Appeals has held that "[a]n impairment that interferes with an individual's ability to do a particular job, but does not significantly decrease the individual's ability to obtain satisfactory employment elsewhere, does not substantially limit the major life activity of working." *Stevens*, 559 N.W.2d at 64.

Plaintiff implies that while her new position was impossible to perform with her impairment, she could have performed in her former position because it did not require lifting and required less time typing on a computer keyboard. Moreover, since she resigned, she has been working as an appraiser for Greyhound Appraisal & Investments. Therefore, it is apparent that while her impairment may have interfered with her ability to perform certain jobs, it did not impair from performing other satisfactory work.

■ Moreover, the Michigan Court of Appeals, in *Chiles*, elaborated on the prin-

ciple that temporary impairments are not "substantial" for the purposes of the PWDCRA:

> To determine whether an individual is substantially limited, a court considers (i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment, and (iii) the permanent or expected permanent or long-term effect. Thus, a disability normally does not include temporary medical conditions, even if those conditions require extended leaves from work. This Court noted that "intermittent, episodic impairments are not disabilities, the standard example being a broken leg." The length of the 'temporary' impairment need not be brief ... Reading the statutory language plainly, an impairment cannot be "substantial" if it is of a merely temporary nature. The types of impairments that are generally temporary are often commonly shared by many in the general public—nearly everyone suffers temporary injuries or maladies at some point in life. Yet the intent of the Legislature here, as well as that of Congress with the federal disability discrimination statutes, was that disability discrimination claims be available only to those with characteristics that are *not* commonplace and are not directly related to the ability to do the job.

*Chiles*, 606 N.W.2d at 408–409. The court concluded that the "PWDCRA connotes some sense of permanency." *Id.* at 409.

In that case, since the plaintiff's work restrictions were eventually lifted, the court found that his impairments did not embody any sense of permanency. *Id.*

In this case, Plaintiff has not provided any evidence that her injuries are permanent. When she resigned from MDC, her injuries were nearly one year old, and at the time she filed this suit, her injuries were only fifteen months old. Without presenting any evidence that her injuries will be permanent, Plaintiff's injuries seem to fit squarely within the *Chiles* court's description of a temporary injury that many people suffer at some point in their lives, but do not constitute a disability within the purpose of the anti-discrimination statutes.

▮▮▮▮ At oral argument, Plaintiff argued that the Court should not grant summary judgment on this ground because there was no evidence showing her injury was temporary. Plaintiff, however, has the burden to come forward with evidence to support each essential element of her claim, including whether she is disabled. It is her burden to come forward with evidence showing her injury is not temporary. Accordingly, because Plaintiff has not presented sufficient evidence for a factfinder to reasonably conclude that she is disabled under the PWDCRA, Defendant's motion for summary judgment as to both of Plaintiff's claims under the PWDCRA (violation of the PWDCRA and retaliation) is GRANTED.[3]

---

**3.** Even if she were disabled under the PWDCRA, her claims would still be dismissed on summary judgment. As to the allegation that Defendant failed to accommodate her disability, Plaintiff must show that the needed accommodations were reasonable, that the accommodations would not impose undue hardship upon the employer, and that she would have been capable of performing the job with the suggested accommodation. *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir.1996). Certainly, Plain-

tiff's requested accommodations—ergonomic keyboard, chair, and lifting restrictions—were reasonable. Defendant provided a new ergonomic chair (albeit one that Plaintiff thought was insufficient), and did accommodate her lifting restriction, even though she had to request assistance every time she needed help. She never received the keyboard, but also never complained or reminded her superiors that she needed one. As to her complaint about breaks, the doctor's note identifying her restrictions requires breaks to attend physical

## B. Family and Medical Leave Act

Plaintiff claims that Defendant violated her rights under the FMLA by not allowing her to return to work in the same position. Defendant does not contest that Plaintiff was entitled to twelve weeks of leave under the FMLA. Rather, Defendant moves for summary judgment because it reinstated Plaintiff to an equivalent position, it had a legitimate, non-discriminatory reason for eliminating Plaintiff's position while she was on her medical leave, and Plaintiff exceeded the twelve weeks of medical leave provided by the FMLA.

### 1. Equivalent Position

■ The Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*, provides eligible employees with a total of twelve weeks of leave during any twelve month period if, among other reasons, the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The statute further provides:

(a) Restoration to position

(1) In general

Except as provided in subsection (b) of this section, any eligible employee who takes leave under section 2612 of this title for the intended purpose of the leave shall be entitled, on return from such leave -

(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or

(B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614.

The federal regulation defining an equivalent position states:

(a) An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority ... (f) The requirement that an employee be restored to the same or equivalent job with the same or equivalent pay, benefits, and terms and conditions of employment does not extend to de minimis or

therapy sessions—not coffee or bathroom breaks. It is those latter types of breaks that Plaintiff complains of Defendant not giving her.

As to the retaliation claim, Plaintiff has not identified any adverse employment action Defendant took against her. She was not, as she claims, constructively discharged. "For a transfer or reassignment to amount to a constructive discharge, its conditions must be objectively intolerable to a reasonable person. An employee's subjective impressions as to the desirability of one position over another are not relevant." *Policastro v. Northwest Airlines, Inc.,* 297 F.3d 535, 539 (6th Cir. 2002) (internal citations omitted). Michigan law provides a similar reasonable person standard for constructive discharge, requiring

conduct that "is so severe that a reasonable person in the employee's place would feel compelled to resign." *Agnew v. BASF Corp.,* 286 F.3d 307, 309 (6th Cir.2002)(citing Michigan case law).

None of Defendant's actions created a working environment that would have been intolerable to a reasonable person. She claims that her trouble getting along with coworkers and her supervisors' scrutinizing her work more harshly than other employee's work, and working fixed hours instead of flextime were the intolerable conditions, but those are insufficient to compel a reasonable person to quit. Moreover, none of the other items she lists are sufficient by themselves to constitute an adverse employment action. Therefore, Plaintiff's retaliation claims fail.

intangible, unmeasurable aspects of the job.

29 C.F.R. § 825.215.

The Fourth Circuit decided that an FMLA plaintiff who worked as an administrative aide to the warden of a prison before taking her leave, and who was reassigned to a position as a secretary in the maintenance department after her return, was restored to an equivalent position under the FMLA. *Montgomery v. Maryland,* 266 F.3d 334, 341 (4th Cir.2001) (vacated on other grounds by *Montgomery v. Maryland,* 535 U.S. 1075, 122 S.Ct. 1958, 152 L.Ed.2d 1019 (2002)). There, the court found that the differences in the positions were the sorts of "de minimis, intangible, and unmeasurable aspects of a job that the regulations specifically exclude." *Id.* The differences were that her former position required administrative functions, but the new position was simple, menial, and only clerical, that she lost her own private work area, and that she had diminished job security. *Id.* The court reasoned that because her pay grade and increment level remained the same, her classification remained the same, and she actually received a pay raise in her new position, the positions were equivalent. *Id.* Her complaints about the complexity of the job and the loss of work space were de minimis concerns. *Id.* Similarly, the First Circuit has construed the term "equivalent position" to mean "that which is substantially equal or similar, not necessarily identical or the same." *Watkins v. J & S Oil Co.,* 164 F.3d 55, 59 (1st Cir.1998).

In this case, then, the issue is whether Plaintiff's two positions were equivalent in terms of pay, benefits, perquisites and status. Defendant argues that Plaintiff's new position carried equal pay and benefits to her former position and therefore the two are equivalent. While that may be true, the regulation also requires equivalent status, and the two positions were not equiva-lent in terms of status: a data-entry job is not as sophisticated, nor does it require a similar level of training and education, as a computer analyst. Therefore, the jobs were not equivalent and Defendant is not entitled to summary judgment on that ground.

### 2. Non–Discriminatory Reason for Eliminating the Position

■ Defendant also contends that it is not liable for an FMLA violation because it had a legitimate business reason for reinstating Plaintiff to a different position. Specifically, Defendant claims that for business reasons, it eliminated two of the three conversion programmer positions altogether, so that Plaintiff's job was simply not available upon her return. 29 C.F.R. § 825.216 provides, in part, the following limit on when an employer is required to reinstate an employee following the employee's FMLA leave:

(a) An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment. For example:

(1) If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave, maintain group health plan benefits and restore the employee cease a the time the employee is laid of, provided the employer has no continuing obligations under a collective bargaining agreement or otherwise. An employer would have the burden of proving that an employee would have been laid off during the

FMLA leave period and, therefore, would not be entitled to restoration. 29 C.F.R. § 825.216. While the regulation only explicitly applies to an employer's denial of restoration of employment, it would seem to apply by analogy to the denial of restoration to an equivalent position as well.

In what appears to be in conflict with this regulation, which clearly puts the burden on the defendant to prove that the employee would have been terminated without taking an FMLA leave, the Sixth Circuit has adopted the *McDonnell Douglas* burden shifting analysis for this type of defense. *Skrjanc v. Great Lakes Power Service Co.,* 272 F.3d 309 (6th Cir.2001). In *Skrjanc,* the plaintiff informed the defendant employer that he intended to take a three month leave to have surgery performed on his foot. *Id.* at 312. Before the plaintiff took his leave, the defendant discharged him, explaining that the company was eliminating an entire unit of their business, and he was employed in that unit. *Id.* The court first concluded that the plaintiff had presented a prima facie case of retaliatory discharge because (1) he availed himself of a right protected by the FMLA by giving the employer notice of his intent to take a three-month leave; (2) he suffered an adverse employment action; and (3) the close proximity in time between the plaintiff's notice to the employer and the employer's termination decision constituted indirect evidence that the employer's decision was caused by the plaintiff's notice. *Id.* at 314. Next, the court stated that in an FMLA retaliation case, when the plaintiff relies on indirect evidence, the court applies the three-step analysis outlined in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under that analysis, once the plaintiff shows a prima facie case, the burden shifts to the defendant to state a legitimate, nondiscriminatory reason for the plaintiff's discharge. *Id.* at

315. If the defendant can articulate such a reason, then the burden returns to the plaintiff to prove that the reason is merely pretext designed to mask discrimination. *Id.*

The *McDonnell Douglas* analysis seems to conflict with 29 C.F.R. § 825.216 in that *McDonnell Douglas* only requires the defendant to state a legitimate reason, and the plaintiff then has the burden of providing evidence to disprove the statement. The federal regulation, however, places the burden on the defendant to prove the legitimate reason is supported by the facts.

Under either standard, Defendant's argument fails. Mr. Caruso averred that when Plaintiff began her disability leave, she was one of three conversion programmers. (Caruso Aff. ¶ 13.) Between then and Plaintiff's return, Defendant decided to eliminate two of the three positions. *Id.* One programmer stayed on, the other was transferred to another position, and Plaintiff was assigned to a different position upon her return. *Id.* The evidence, however, creates a question of fact as to what its true motivations were. Plaintiff testified (albeit very sketchily) that she believes there was another woman working in her former position while Plaintiff was working as a receipt clerk. If true, then that would disprove Defendant's claim that the position was eliminated. In addition, after Plaintiff had been on leave for almost two months, Defendant wrote her a letter informing her that if she returned to work immediately, she could continue working as a Conversion Programmer, but if she took additional leave, Defendant would not guarantee that she could return to that position. That letter did not indicate that the position was being eliminated and that even if she returned immediately her position may be eliminated. Therefore, Defendant is not entitled to summary judgment

because it eliminated Plaintiff's position for legitimate business purposes.

### 3. Leave In Excess of the Guaranteed Twelve Weeks

The FMLA guarantees only twelve weeks of unpaid leave. Plaintiff's accident was on June 29, 2001, a Friday, so the first day of her leave would have been Monday, July 2, 2001. Her FMLA leave expired after twelve weeks, requiring her return on September 24, 2001. It is undisputed that Plaintiff was unable to return to and did not work on September 24. In *Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 784–85 (6th Cir. 1998), the Sixth Circuit affirmed summary judgment on a claim of retaliatory firing after the plaintiff took a medical leave of absence. There, the plaintiff was unable to return to work after twelve weeks, and the district court concluded that because the plaintiff could have been terminated as of the date her FMLA leave expired without running afoul of the FMLA, her employer's decision to terminate her three weeks after that expiration date did not violate the FMLA. *Id; Cehrs v. Northeast Ohio Alzheimer Research Ctr.*, 959 F.Supp. 441, 449–50 (N.D.Ohio 1997). Under *Cehrs*, once Plaintiff exhausted her FMLA leave and was still unable to return to work, she lost the protection of the FMLA.

Nevertheless, Plaintiff argues that the FMLA protected her upon her return by the FMLA because Defendant failed to give her notice that the first twelve weeks of her leave would be an FMLA leave. Plaintiff argues that because Defendant did not designate Plaintiff's leave as FMLA leave, and instead designated her leave as short-term disability, she is entitled to the FMLA twelve-week protected leave period beginning with the proper designation.

29 C.F.R. § 825.208 provides:

(a) ... it is the employer's responsibility to designate leave, paid or unpaid, as FMLA qualifying, and to give notice of the designation to the employee as provided in this section ...

(c) If the employer requires paid leave to be substituted for unpaid leave, or that paid leave taken under an existing leave plan be counted as FMLA leave, this decision must be made by the employer within two business days of the time the employee gives notice of the need for leave ... If the employer has the requisite knowledge to make a determination that the paid leave is for an FMLA reason at the time the employee either gives notice of the need for leave or commences leave and fails to designate the leave as FMLA leave ... the employer may not designate the leave as FMLA leave retroactively, and may designate only prospectively as of the date of notification to the employee of the designation. In such circumstances, the employee is subject to the full protections of the Act, but none of the absence preceding the notice to the employee of the designation may be counted against the employee's 12–week FMLA leave entitlement.

Plaintiff relies on *Plant v. Morton Int'l, Inc.*, 212 F.3d 929 (6th Cir.2000). In *Plant*, the Sixth Circuit held that when an employer gave an employee paid leave as opposed to unpaid leave, and failed to designate the leave as required by 29 C.F.R. § 825.208, the holding in *Cehrs* is not applicable. *Id.* at 933. Like the present case, in *Plant* the defendant placed the plaintiff on its own paid disability program and did not provide notice to the plaintiff that his first twelve weeks on that program would count as his FMLA leave. The Sixth Circuit split with other circuits that had struck down § 825.208(a) and (c), and ruled that the regulations were valid. *Id.* at 935–36.

*Plant*, however, may no longer be good law in light of *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 122 S.Ct. 1155, 152 L.Ed.2d 167 (2002). There, the Supreme Court held that when an employer terminated an employee after she took a thirty week leave of absence, the employer did not violate the FMLA even though the employer did not inform the employee that her leave of absence would count as her FMLA leave. The plaintiff suffered from Hodgkin's disease and needed to undergo surgery and months of radiation therapy. *Id.* at 1159. After the plaintiff missed thirty consecutive weeks of work, she requested an additional thirty days, which the defendant denied pursuant to its own disability leave policy. *Id.* The defendant terminated her when she did not return to work. *Id.* The defendant never notified the plaintiff that twelve weeks of her absence would count as her FMLA leave. *Id.* The plaintiff sued the defendant, arguing that because the defendant did not notify her that her FMLA leave began running, she was entitled to an additional twelve weeks of leave. *Id.* She relied on 29 C.F.R. § 825.700(a) (2001), which provided that if an employee took a medical leave "and the employer does not designate the leave as FMLA leave, the leave taken does not count against an employee's FMLA entitlement." *Id.*

The Supreme Court held that the regulation was invalid "because it alters the FMLA's cause of action in a fundamental way: It relieves employees of the burden of proving any real impairment of their rights and resulting prejudice ... By its nature, the remedy created by Congress requires the retrospective, case-by-case examination the Secretary now seeks to eliminate. The purpose of the cause of action is to permit a court to inquire into matters such as whether the employee would have exercised his or her FMLA rights in the absence of the employer's actions." *Id.* at 1162. The Court also

noted that the regulation could serve to punish employers who provide more generous benefits than the FMLA requires, and such punishment would conflict with the FMLA's warning that "[n]othing in this Act ... shall be construed to discourage employers from adopting or retaining leave policies more generous than any policies that comply with the requirements under this Act." 29 U.S.C. § 2953; 122 S.Ct. at 1164.

Even though *Ragsdale* expressly invalidated only § 825.700(a), that regulation's notice provisions are almost identical to those in § 825.208, and its reasoning and holding—that when an employer violates a regulation by failing to give notice that an employee's leave will be counted as their FMLA leave, the employee is not automatically entitled to additional leave or FMLA protection—should apply equally to Plaintiff's argument here. *See Summers v. Middleton & Reutlinger, P.S.C.*, 214 F.Supp.2d 751, 757 (W.D.Ky.2002) (recognizing *Ragsdale*'s implied overruling of *Plant*, and holding that the plaintiff must show actual prejudice as a result of the defendant's failure to notify her that her leave was an FMLA leave); *Roberson v. Cendant Travel Services, Inc.*, 252 F.Supp.2d 573, 577 (M.D.Tenn.2002) (same).

Therefore, if Plaintiff could show that she was somehow prejudiced by Defendant's failure to designate her disability leave as FMLA leave, then Defendant could be liable for not giving her proper notice. Here, Plaintiff has not identified any prejudice she suffered because of Defendant's failure to give notice. The undisputed evidence, in the form of notes from her treating physicians, establishes that she was physically unable to return to work after twelve weeks. Therefore, even if Defendant had properly notified her that the first twelve weeks of her leave was

FMLA leave (or, as she claims, even if Defendant granted her express request for FMLA leave), she would have had to switch to Defendant's own disability leave plan at the expiration of her FMLA leave, and upon her return she would have returned from her employer's leave, not her FMLA leave.

Plaintiff also contends that since full-time employees are entitled to sick pay, personal time, and vacation time, Plaintiff should have been allowed to use all of her sick, personal, and vacation time before the FMLA leave began to run. Plaintiff's argument is unavailing because Plaintiff's "Employee Year at a Glance" calendar for 2001 shows that she only had twelve hours of sick time, two hours of personal time, and a negative of thirty-four hours of vacation time left in her allotment. (Pl.Ex. J.) Therefore, even if Defendant used these other types of leave first, her six-month leave exceeded those leaves combined with the FMLA leave. Accordingly, because Plaintiff did not, and could not, return after twelve weeks, she was no longer protected by the FMLA and Defendant did not violate the FMLA by reinstating her as a receipt analyst instead of as a conversion programmer.

## C. Intentional Infliction of Emotional Distress

 Plaintiff must show the following elements to establish a claim for the intentional infliction emotional distress:

(1) extreme and outrageous conduct;
(2) intent or recklessness;
(3) causation;
(4) severe emotional distress.

*Roberts v. Auto-Owners Ins. Co.*, 422 Mich. 594, 374 N.W.2d 905, 908 (1985).

Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. It is not enough that the defendant has acted with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice" or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort ... The test is whether the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Graham v. Ford*, 237 Mich.App. 670, 604 N.W.2d 713, 716 (1999) (internal citations omitted).

Plaintiff complains that Defendants' actions relating to her other claims constitute extreme and outrageous conduct. In other employment cases, however, Michigan courts have held that far more offensive conduct than the conduct in this case was not extreme or outrageous enough for an intentional infliction of emotional distress claim. For example, in *Graham*, the Michigan Court of Appeals found that insults, indignities, threats, annoyances and petty oppressions were insufficient as a matter of law to be extreme and outrageous conduct. *Id.* Likewise, in *Meek v. Mich. Bell Tel. Co.*, 193 Mich.App. 340, 483 N.W.2d 407, 410 (1991), the court concluded that workplace comments such as calling the plaintiff "chubbly," asking the plaintiff who she had slept with to get her job, calling her a Jewish–American princess, and asking her to get rid of her purse and change her shoe style did not rise to the level of outrageous and extreme to support an intentional infliction of emotional distress claim.

In this case, none of Defendant's conduct was so extreme that a reasonable person would exclaim "Outrageous!" upon reviewing the facts described above. Therefore, Defendant's motion for summary judgment on Plaintiff's claim for the intentional infliction of emotional distress is GRANTED.

## IV. Conclusion

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

Defendant's motion for summary judgment is GRANTED, and this case is hereby DISMISSED.