Per Curiam.
 

 Plaintiffs appeal as of right from an order granting summary disposition in favor of defendants Larry Ford and Department of Corrections pursuant to MCR 2.116(C)(10) based on the determination that plaintiffs failed to create any genuine issue of material fact concerning whether defendants intended to cause the injury alleged by plaintiffs or whether defendants discriminated against plaintiffs on the basis of race or race association. Plaintiffs earlier had all claims regarding James Yarborough dismissed, which claims are not before this Court. We affirm in part, reverse in part, and remand.
 

 On appeal, we review a trial court’s ruling on summary disposition de novo.
 
 Spiek v Dep’t of Transportation,
 
 456 Mich 331, 337; 572 NW2d 201 (1998). A motion for summary disposition under MCR 2.116(C)(10) tests whether there is factual support for a claim. When deciding a motion for summary disposition, we consider the pleadings, affidavits, depositions, admissions, and other documentary evidence.
 
 Id.
 
 In presenting a motion for summary disposition, the moving party has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence.
 
 Smith v Globe Life Ins Co,
 
 460 Mich 446, 454-455; 597 NW2d 28 (1999). The burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists.
 
 Id.
 
 at 455. Where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving
 
 *673
 
 party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists.
 
 Id.
 
 If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted.
 
 Id.
 

 Plaintiffs were employees of defendant Department of Corrections and their supervisor was defendant Larry Ford. Plaintiffs claimed that defendant Ford specifically intended to inflict emotional distress on them, thereby invoking the “intentional tort” exception to the exclusive remedy provision of the Worker’s Disability Compensation Act (wdca), MCL 418.131; MSA 17.237(131). Plaintiffs argue that the trial court either ignored evidence that demonstrated defendant Ford’s intent to injure them or failed to view this evidence in a light most favorable to plaintiffs. We disagree.
 

 Generally, the exclusive remedy available to an employee for a claim of work-related injury is provided by the wdca. However, under subsection 131(1) of the act, an employer may be held liable for an intentional tort. Thus, a plaintiff may recover from his employer where he establishes what is generally regarded as a “true intentional tort,” that is, one in which the employer “specifically intended an injury.”
 
 Cavalier Mfg Co v Employers Ins of Wausau,
 
 211 Mich App 330, 336; 535 NW2d 583 (1995). This section applies equally to the alleged intentional torts of a coemployee.
 
 Travis v Dreis & Krump Mfg Co,
 
 453 Mich 149, 171-172; 551 NW2d 132 (1996). Plaintiffs in this case alleged defendant Ford intentionally inflicted emotional distress, a “true intentional tort.”
 
 *674
 
 Whether the facts alleged by the plaintiffs are sufficient to constitute an intentional tort within the meaning of the act is a question of law for the court.
 
 Palazzola v Karmazin Products Corp,
 
 223 Mich App 141, 146-147; 565 NW2d 868 (1997);
 
 Smith v Mirror Lite Co,
 
 196 Mich App 190, 193; 492 NW2d 744 (1992).
 

 In order to invoke the tort of intentional infliction of emotional distress, and thus come within the intentional-tort exception, plaintiffs had to establish (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress.
 
 Haverbush v Powelson,
 
 217 Mich App 228; 551 NW2d 206 (1996). Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.
 
 Doe v Mills,
 
 212 Mich App 73, 91; 536 NW2d 824 (1995). Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.
 
 Id.
 
 It is not enough that the defendant has acted with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by “malice,” or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort.
 
 Roberts v Auto-Owners Ins Co,
 
 422 Mich 594, 602-603; 374 NW2d 905 (1985), quoting Restatement Torts, 2d, § 46, comment d, pp 72-73. In reviewing a claim of intentional infliction of emotional distress, we must determine whether the defendant’s conduct is sufficiently unreasonable as to be regarded as extreme and outrageous.
 
 Doe, supra
 
 at 92. The test
 
 *675
 
 is whether “the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, ‘Outrageous!’ ”
 
 Roberts, supra
 
 at 603.
 

 On review of the record, including some thirty deposition transcripts, we find that there was no genuine issue of fact concerning whether defendant Ford’s conduct rose to the required level of extreme and outrageous conduct. While defendant Ford’s alleged actions, in some respects, may have been inconsiderate or thoughtless, we find that they must be characterized as nothing more than insults, indignities, threats, annoyances, or petty oppressions and are insufficient as a matter of law to be considered extreme and outrageous conduct.
 
 Doe, supra
 
 at 91. Moreover, plaintiffs cannot succeed in attempting to establish the intent requirement of the intentional-tort exception to the wdca by presenting what we consider essentially disconnected facts possessed by various employees of defendant Department of Corrections.
 
 Travis, supra
 
 at 171-172. Even if the facts as alleged by plaintiffs are considered true, they do not demonstrate extreme and outrageous conduct or a specific intent on Ford’s part to inflict the alleged injury of emotional distress on plaintiffs.
 

 Plaintiffs next argue that the trial court erred in granting summary disposition because they presented sufficient evidence to raise a genuine issue of material fact concerning whether defendant Ford, who is black, discriminated against plaintiffs Timothy M. Travis and William E. England, who are white, on the basis of their race. Plaintiffs further argue that, contrary to the trial court’s ruling, they established a genuine issue of material fact regarding whether defend
 
 *676
 
 ant Ford discriminated against plaintiffs Maxim Graham and Tony M. Brandon, who are black, on the basis of their association with white employees of defendant Department of Corrections. We agree.
 

 Section 202 of the Civil Rights Act, MCL 37.2202; MSA 3.548(202), provides in part:
 

 (1) An employer shall not do any of the following:
 

 (a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status.
 

 Under § 202, a plaintiff asserting a claim of racial discrimination must show that race was a motivating factor in the defendant’s decision to discriminate, but need not show that race was the exclusive cause.
 
 Bryant v Automatic Data Processing, Inc,
 
 151 Mich App 424, 428; 390 NW2d 732 (1986).
 

 Here, plaintiffs claimed that defendants intentionally discriminated against them. Intentional discrimination may be established by direct or indirect evidence.
 
 Harrison v Olde Financial Corp,
 
 225 Mich App 601, 606; 572 NW2d 679 (1997). A plaintiff must show that the defendant was predisposed to discriminate against the plaintiff and actually acted on that disposition.
 
 Manning v City of Hazel Park,
 
 202 Mich App 685, 697; 509 NW2d 874 (1993).
 

 In analyzing discrimination claims arising under the Civil Rights Act, Michigan courts have often resorted to federal precedent for guidance.
 
 Harrison, supra
 
 at 606. “Direct evidence” has been defined in the Sixth Circuit Court of Appeals as evidence that, if believed, “requires the conclusion that unlawful discrimination
 
 *677
 
 was at least a motivating factor.”
 
 Id.
 
 at 610. For example, racial slurs by a decisionmaker constitute direct evidence of racial discrimination that is sufficient to allow a plaintiffs case to proceed to the jury.
 
 Id.
 
 In a case involving direct evidence of discrimination, the plaintiff always bears the burden of persuading the trier of fact that the employer acted with illegal discriminatory animus.
 
 Id.
 
 at 612. Whatever the nature of the challenged employment action, the plaintiff must establish direct proof that the discriminatory animus was causally related to the decisionmaker’s action.
 
 Id.
 
 at 613. Under such circumstances, the case ordinarily must be submitted to the factfinder for a determination whether the plaintiff’s claims are true.
 
 Id.
 

 With regard to plaintiffs’ claims of discrimination based on association, the United States Supreme Court has determined that discrimination on the basis of racial affiliation and association is a form of discrimination.
 
 Bob Jones Univ v United States,
 
 461 US 574, 605; 103 S Ct 2017; 76 L Ed 2d 157 (1983). This Court also addressed this issue in the context of interracial marriage in
 
 Bryant, supra
 
 at 430, and stated:
 

 The purpose of the Civil Rights Act is to prevent discrimination against persons based on their membership in a certain class and to “eliminate the effects of offensive or demeaning stereotypes, prejudices and biases.”
 
 Miller [v CA Muer Cory,
 
 420 Mich 355, 362-363; 362 NW2d 650 (1984)]. . . . We believe both the broad language of the civil rights act and the policies behind the act should be read to provide protection from discrimination for interracial couples. If an employer discriminates against a white (or black) employee because of the latter’s marriage to a black (or white) spouse, the race of both the employee and spouse is a motivating factor. Thus it must be concluded
 
 *678
 
 that the employee in such a case is discriminated against “because of race” and the civil rights act is applicable.
 

 In light of the broad language of § 202 and “the policies behind the act,” we believe § 202 should be read to provide protection from discrimination for associating with coemployees in the workplace. Moreover, claims seeking recovery for physical, mental, or emotional injury resulting from employer discrimination in violation of civil rights acts are not barred by the exclusive remedy provision of MCL 418.131(1); MSA 17.237(131)(1).
 
 Adams v Nat’l Bank of Detroit,
 
 444 Mich 329, 338; 508 NW2d 464 (1993).
 

 We are satisfied that the record in this case provides sufficient evidence of defendant Ford’s discriminatory predisposition and animus toward plaintiffs based on race and race association; plaintiffs presented evidence that defendant Ford based job assignments and promotions on race, made racial comments to and statements about plaintiffs and other subordinates, and regarded the black plaintiffs unfavorably because of their working relationships with white corrections employees. Among the elements of the record that sustain us in this view are the following:
 

 (1) Plaintiff Graham’s testimony that defendant stated that he was “trying to get more black supervisors” in the correctional facility.
 

 (2) Plaintiff Graham’s testimony that defendant inquired of Graham’s wife, “Would you let [your husband] move you up here with all these white folks?”
 

 (3) Plaintiff England’s testimony that, shortly after being promoted to captain, defendant told him to break up “Timmy boy’s white boy clique,” referring to
 
 *679
 
 plaintiff Travis, a white officer. England stated that Ford made the request to break up the “clique” on an on-going basis. It was England’s belief that what defendant meant by “Timmy boy’s white boy clique” was that Travis was showing partiality to the white officers on the shift; England saw no evidence of this.
 

 (4) Plaintiff England’s testimony that defendant asked him to go to the night shift to take care of “some real serious problems” and was told it would only be for six months. This assignment lasted for approximately nine months; according to England, this amounted to abusive treatment that, in his judgment, was racially motivated. According to England, every time defendant would come to visit the night shift, he would be verbally abused by defendant. England testified that Ford referred to him on many occasions as a “honkey,” stating “you honkeys are all alike.”
 

 (5) Plaintiff Travis’ testimony that defendant said to him on one occasion in response to Travis’ acknowledgment of a promotion, “I believe there is an occasional white stallion out there amongst us black ones, and we have to acknowledge you once in a while.”
 

 (6) Plaintiff Travis’ testimony that defendant was of the view that Travis used white officers “to handle [his] trouble.”
 

 (7) Plaintiff Brandon’s testimony that defendant would make “snide” remarks to him regarding Brandon “being too friendly.” He testified that he took the “too friendly” comments to mean that he was too friendly with the white officers.
 

 (8) Plaintiff Brandon’s testimony that defendant asked him why plaintiff Graham was “living up here with the white people,” and stated to Brandon that
 
 *680
 
 Graham was “too friendly with the white officers.” Brandon also stated that he had been asked by Deputy Warden Janette Price to participate in an internal affairs investigation about a “white boy clique.” However, Brandon testified that he had no knowledge that this “clique” even existed.
 

 (9) Arthur Clark’s testimony that he had the impression from what he had heard over time that there was a racial element in terms of how defendant treated subordinates. For example, according to Clark, promotions generally seemed to be handed out to blacks more than whites.
 

 (10) Gary Banfil’s testimony that plaintiff Graham was a friend of his and told him that defendant considered Graham an “Uncle Tom.”
 

 (11) Max Wright’s testimony that he heard through another officer that defendant “didn’t want any white guy running [the] control center.”
 

 (12) William Dechelbor’s testimony that defendant may have treated blacks differently than whites, but that defendant was probably more critical of his own race. Defendant allegedly thought that certain black employees, including plaintiff Graham, could do a “far better job portraying their race.”
 

 (13) Ricky Risk’s testimony that defendant had him removed from working in the control office because he “smile[d] too much and he’s white.” Risk also stated that defendant used racial terms, such as “boy,” on “many occasions” and that he engaged in breaking up a “white boy clique” by transferring officers to various shifts. According to Risk, at least on one occasion, defendant was responsible for promoting a corrections officer to sergeant because he
 
 *681
 
 was black and had agreed to assist defendant in “bust[ing] up this honkey clan.”
 

 (14) Roger Prater’s testimony that he was aware of one black employee who was treated differently by defendant because this individual associated with white Handlon Michigan Training Unit officers.
 

 (15) Philip Hughes’ testimony that he had heard that defendant considered plaintiff Graham an “Uncle Tom” because Graham lived in a white community. Hughes also stated that, in his opinion, defendant, while not a racist, “manage [d] through a perception of race”; according to Hughes, defendant would delegate to white employees “things that are more difficult,” such as “technical-type paperwork,” because defendant had a perception that “perhaps white guys had better organizational and writing skills.”
 

 In light of this evidence, we believe that plaintiffs’ claims of discrimination based on race and race association should have been presented to the factfinder. Harrison,
 
 supra
 
 at 613.
 

 We affirm the order granting summary disposition with regard to plaintiffs’ claims of intentional infliction of emotional distress. We reverse the grant of summary disposition with regard to plaintiffs’ claims of racial discrimination and remand to the trial court for further proceedings consistent with this opinion.
 

 Affirmed in part, reversed in part, and remanded. We do not retain jurisdiction.