**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 18a0008n.06

Case No. 16-2741

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**

Jan 05, 2018

DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| ELISE HILTON, et al, | ) | |
| | ) | |
| Plaintiffs-Appellants, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| CATHERINE MISH, et al., | ) | MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: SILER, CLAY, and WHITE, Circuit Judges.

**SILER**, Circuit Judge. Elise and Ed Hilton, individually, and as next friends of their developmentally-disabled daughter, EH (collectively, the "Hiltons"), appeal the district court's dismissal of their complaint. They argue that the district court erred in three respects. They allege that Catherine Mish, City Attorney for Grand Rapids, was acting under color of state law when she sent two emails from her City email to a private individual. Second, they allege that Mish's comments were retaliatory conduct under clearly established First Amendment law. Third, they allege that the district court erred in dismissing their intentional infliction of emotional distress ("IIED") claim. We affirm.[1]

---

[1] We assume without deciding that (1) Mish was acting under color of state law when she sent the emails and (2) the Hiltons have established a constitutional violation.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Parties

At the time relevant to this case, Elise worked at the Acton Institute ("Acton"), a political think tank and advocacy group located in the City of Grand Rapids ("City").

The City is a Michigan municipal corporation.  As City Attorney, Mish's duties included:

- Acting as the legal advisor for the City and its various bodies;
- Litigating cases for the City and its bodies;
- Reviewing all contracts, bonds and other instruments for the City and its bodies;
- Issuing legal opinions when requested to do so by any of the City's bodies and officials;
- Maintaining copies of all franchises granted by the City and all contracts and agreements entered into by the City; and
- Investigating citizen complaints concerning, among other things, misapplication of the City's funds.

### II.      Factual/Procedural Background

In January 2012, EH[2] was a student at Hope Academy in Grand Rapids, a school intended to help individuals with special needs.  One day at school, EH acted up and the Academy staff told her to leave the school.  After EH left the school, a stranger lured her into a house, and over the course of the next several days, repeatedly raped her.  Eventually, EH escaped from the house and was later found in an abandoned building.

The Hiltons asked the City for help.  After interviewing EH and the Hiltons, a Grand Rapids Police Department ("GRPD") detective opined that EH would make a "pathetic witness" due to her mental impairments.  The GRPD declined to investigate further, and the prosecutors declined to file charges.

In 2013, the Hiltons filed a civil action in the Western District of Michigan against Hope Academy and GRPD.  Among other violations, the Hiltons alleged that GRPD violated their equal protection rights because it had refused to extend police resources to EH based on adverse

---

[2] EH was a minor at the time of the incidents set forth in the complaint.

considerations of EH's intellectual disability. In 2016, the district court granted the City's and GRPD's motion to dismiss.

In early 2014, Acton applied to the City for real and personal property tax exemptions that the City initially denied. During this dispute, Donald E. Zerial, an attorney, attended City board meetings and advocated for Acton's tax exemptions. He also regularly contacted City officials, including Mish, to express his support of Acton.

In March 2015, Zerial sent an email to Julie Hoogland, the Editor of the *Grand Rapids Press*, stating:

> I think it would be a worth-while investment for the Grand Rapids Press and Mlive to make on behalf of the West Michigan community to have a reporter attending these meetings and do a Press review for all of your faithful readers.

To this email, Zerial attached an advertisement for an upcoming lecture at Acton. The advertisement also promoted other Acton events, including an event entitled "The Scarlet Cord – The Evils of Sex Trafficking with Pam Alderman and Elise Hilton." Mish was apparently copied on the email at her City-provided email address. About an hour after receiving the email, Mish responded to Zerial personally:

> Perhaps you should ask the Acton Institute why they think they should be exempt from paying real property taxes? And why are they suing the City of Grand Rapids to demand their valuable government handout of that real property tax exemption?
>
> For an institute that proclaims the below political message, it seems to me that they are entirely hypocritical in throwing an absolute hissy fit because they didn't get the government handout that they believe they are "entitled" to.

A few hours later, Mish sent Zerial another email:

> I find this particularly ironic. . . .if you scroll down on the attachment you sent me, and get to upcoming events, you see this entry:
>
> April 29–Acton Art Series–The Scarlet Cord - The Evils of Sex Trafficking with Pam Alderman and Elise Hilton

> Elise Hilton is a staff member of Acton Institute here in GR. Her daughter, at the age of 15-16 or thereabouts, ran away from home (ran away from her "alternative" high school in downtown GR). She wandered the streets of downtown Grand Rapids, acting as a prostitute in exchange for heroin, cocaine, alcohol and so forth. Her father talked to her on her cell phone and asked where she was / asked her to come home. She refused to come home and refused to tell her father where she was. The police finally found her after many days of her escapades in trading sex for drugs.
>
> And the result? Ms Elise Hilton the Acton hypocrite dares to sue the City of Grand Rapids blaming the GRPD for the fact that her daughter ran away from home to become a crack and heroin whore. Currently pending litigation. Case No. 1:13-CV-00727, assigned to the Hon. Paul Maloney, U.S. District Court for the Western District of Michigan. Apparently, Ms. Hilton the Acton hypocrite believes that the government is the cause of her family's woes. Therefore, the government owes them a pile of money! It must be the police department's fault, and she and her husband Ed believe they are owed money for this!
>
> The young woman did not run away from home to become a crack and heroin whore because of anything done by the City of Grand Rapids or the GRPD. We did not raise her and did not influence her life choices in this regard. The hypocrisy of the Acton Institute and its employees is simply amazing. Beware that you are dealing with hypocrites, sir.

A year after sending the email, in April 2016, Tom E. Gantert, Managing Editor of Michigan Capital Confidential, sent a Freedom of Information Act ("FOIA") request to the City for information related to the Acton dispute. In response to this request, the City provided the above email chain to Gantert. Gantert forwarded the email to Elise.

After receiving the email, the Hiltons filed the instant three-count lawsuit. In Counts 1 and 2, the Hiltons alleged First Amendment retaliation claims under 42 U.S.C. § 1983. Count 1 alleged that Mish violated the Hiltons' First Amendment right to seek legal redress and Count 2 alleged that Mish violated Elise's First Amendment right of association with her employer. In Count 3, the Hiltons brought a claim for IIED under Michigan law. The City and Mish filed a motion to dismiss all counts for failure to state a claim. The district court granted the motion holding: (1) Mish acted as an individual rather than in her capacity as City Attorney when she

responded to the email; (2) Mish was entitled to qualified immunity because her actions did not violate the Hiltons' First Amendment rights; (3) the City was not liable because the Hiltons failed to properly allege a constitutional violation; and (4) the Hiltons' IIED allegations did not rise to the level of intentional or reckless action.

## STANDARD OF REVIEW

We review de novo a district court's grant of a motion to dismiss. *Laborers' Local 265 Pension Fund v. iShares Tr.*, 769 F.3d 399, 403 (6th Cir. 2014). To survive a motion to dismiss, a claim's "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all of the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

## DISCUSSION

### I.      Violation of Clearly Established Constitutional Law

The Hiltons argue that Mish violated their clearly established First Amendment rights when she sent the email, thus making her ineligible for qualified immunity.

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cty.,* 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant violated a right so clearly established "that every 'reasonable official would have understood that what [s]he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

There are two steps in the qualified immunity analysis. First, "[t]he court must determine whether the 'facts alleged show the officer's conduct violated a constitutional right.'"[3] *Cass v. City of Dayton*, 770 F.3d 368, 374 (6th Cir. 2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If the plaintiff establishes a constitutional violation, the court must then determine "whether that right was 'clearly established.'" *Id.* (quoting *Saucier*, 533 U.S. at 201).

In accordance with *Pearson v. Callahan*, 555 U.S. 223, 236 (2009), we will only address the second step of the qualified immunity analysis: whether the violation was clearly established. The Supreme Court recently reiterated the very narrow scope of a "clearly established law" stating:

> "[C]learly established law" should not be defined "at a high level of generality." As this Court explained decades ago, the clearly established law must be "particularized" to the facts of the case. Otherwise, "[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights."

*White v. Pauly*, 137 S. Ct. 548, 552 (2017) (internal citations omitted).

With this narrow scope in mind, we cannot find that Mish was put on notice that sending an email to a private individual with no authority over the Hiltons would constitute "an adverse action that would likely deter a person of ordinary firmness from continuing to engage in the protected conduct." *Bloch,* 156 F.3d at 678.

To overcome qualified immunity, the Hiltons rely on three cases as evidence of a clearly established adverse action: (1) *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718 (6th Cir. 2010); (2) *Barrett v. Harrington*, 130 F.3d 246 (6th Cir. 1997); and (3) *Bloch*, 156 F.3d 673. However,

---

[3] The elements to sufficiently state a retaliation claim are: (1) the Hiltons engaged in constitutionally-protected conduct; (2) the defendant took an adverse action that would likely deter a person of ordinary firmness from continuing to engage in the protected conduct; and (3) the adverse action was motivated at least in part by the Hiltons' protected conduct. *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).

each is distinguishable. In *Fritz*, the plaintiff opposed the Township's actions. 592 F.3d at 725. After this opposition, the Township Supervisor made statements about the plaintiff to her employer and encouraged her employer to terminate her employment. *Id.* at 728. We held that a "person of ordinary firmness would be deterred from engaging in protected conduct, if as a result, a public official encouraged her employer to terminate the person's contract" because "few aspects of one's life are more important than gainful employment." *Id.* at 726–28. Relying on this case, the Hiltons argue that Mish's alleged defamatory statements constituted an adverse action similar to the alleged defamatory statements in *Fritz*. However, this greatly oversimplifies *Fritz*. *Fritz* does not stand for the proposition that defamatory statements alone are sufficient. Instead, the defamatory statements and the encouragement of termination were sufficient. *Id.* at 727 ("[T]hese potentially defamatory statements were not of such a character that they amounted to an adverse action taken on their own."). In this case, the Hiltons fail to allege a similar action to that of affecting their employment.

In *Barrett*, the plaintiff alleged that a state-court judge retaliated against him for investigating the judge. 130 F.3d at 262. In the alleged retaliation, the judge issued statements to the media that the plaintiff was stalking her. *Id.* Most importantly, we did not address whether the judge's statements to the media constituted an adverse action—the only issue in this appeal. Instead, we considered whether the plaintiff's engagement in protected conduct was a substantial or motivating factor in the judge's statements to the media. *Id.* at 262–63. However, even putting that aside, *Barrett* is distinguishable from this case because the judge issued the statements to the public through media. In this case, Mish's emails were only sent to a private individual.

In *Bloch*, the plaintiff alleged that in response to newspaper articles that were critical of the sheriff's progress in investigating a rape of the plaintiff, the sheriff held a public press conference. 156 F.3d at 676. In this press conference, the sheriff allegedly released highly embarrassing details of the rape that the plaintiff had not even disclosed to her husband. *Id.* We held that the plaintiff adequately alleged an adverse action because the sheriff's right to respond to the criticism did not extend to the release of irrelevant, humiliating, and confidential information. *Id.* at 681. However, *Bloch* is distinguishable from this case because the information was released in a public press conference as opposed to sending an email to a single individual that was never disclosed to the public until a year later.

Accordingly, even assuming that Mish's conduct violated the Hiltons' constitutional rights, none of our precedents clearly established this violation. The district court therefore appropriately granted qualified immunity to Mish.

## II.     Municipal Liability

The Hiltons also argue that the district court erred in dismissing the City. Specifically, the Hiltons argue that the City is liable for Mish's conduct under a theory of municipal liability.

In *Monell v. New York*, the Supreme Court held that municipalities can be subject to direct liability under § 1983 only when the action of the municipality itself can be said to have caused the harm. 436 U.S. 658, 690 (1978). "[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983." *Id.* at 694. "At the very least, there must be an affirmative link between the policy and the particular Constitutional violation alleged." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). Municipal liability is "limited to acts . . . . which the municipality has

officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986). It attaches "only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* at 481.

The Hiltons allege that "Mish had ultimate authority to represent the City in litigation and make decisions for how to perform those duties. As such, because she was an ultimate decisionmaker for how to perform these functions, her actions have the force and effect of policymaking, and, therefore, municipal liability will lie." However, the facts set forth in the complaint fail to establish either that the City's official policy giving Mish the authority to litigate cases "is responsible for [the] deprivation of [the Hiltons' First Amendment] rights," *Monell*, 436 U.S. at 690–91, or that the City "officially sanctioned or ordered" Mish to send the allegedly defamatory comments in the email. *Pembaur*, 475 U.S. at 479. At most, the City's policy giving Mish the authority to litigate cases on its behalf allowed Mish to respond to criticism of litigation strategy of a pending case. However, the policy did not sanction or order Mish to defame the Hiltons to third parties, and the complaint contains no competent allegations to the contrary. Therefore, the "affirmative link between the policy and the [] Constitutional violation" is missing, and accordingly, the complaint fails to plead facts that would support municipal liability. *Tuttle*, 471 U.S. at 823.

### III. Intentional Infliction of Emotional Distress

The Hiltons argue that the district court erred in dismissing their IIED claim. Specifically, the Hiltons argue that "Mish made this statement in a public document subject to production under FOIA" and that "[i]t was reasonably foreseeable that this statement would get back to the Hiltons."

For a claim of IIED, plaintiffs must allege (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *See Hayley v. Allstate Ins. Co.*, 686 N.W.2d 273, 276 (Mich. Ct. App. 2004). "The conduct complained of must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.'" *Id.* (quoting *Graham v. Ford*, 604 N.W.2d 713, 716 (Mich. Ct. App. 1999)).

"The test to determine whether a person's conduct was extreme and outrageous is whether recitation of the facts of the case to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"" *Lewis v. LeGrow*, 670 N.W.2d 675, 689 (Mich. Ct. App. 2003). "Th[is] question should be presented to the jury if reasonable minds may differ regarding whether the conduct was, indeed, extreme and outrageous." *Burke v. Detroit Pub. Sch.,* No. 262983, 2006 WL 1156366, at *12 (Mich. Ct. App. May 2, 2006). But, a defendant may not be held "liable for mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Lewis*, 670 N.W.2d at 689 (quoting *Doe v. Mills,* 536 N.W.2d 824, 833 (Mich. Ct. App. 1995)).

In this case, the portions of the email calling EH a "crack and heroin whore" are the closest statements to "extreme and outrageous conduct," as the rest of Mish's email provides factual background to the lawsuit initiated by the Hiltons. Although such statements are certainly shameful and inappropriate, especially coming from a public official, we cannot find these statements actionable because they were only intended to be seen by a single unrelated third party through a private email, and the Hiltons only became aware of the statements by chance roughly a year after they were made. Under the circumstances presented by this case, Mish's conduct does not clear the high bar for "outrageous" conduct set by Michigan law. *See,*

Case No. 16-2741, *Elise Hilton, et al. v. Catherine Mish, et al.*

*e.g.*, *Graham v. Ford*, 604 N.W.2d 713, 716 (Mich. Ct. App. 1999) (finding "inconsiderate and thoughtless" conduct non-actionable in a lawsuit where the defendant allegedly made many racially insensitive comments).

**AFFIRMED**.

**HELENE N. WHITE, Circuit Judge, concurring in part and dissenting in part.**

I agree that the Hiltons cannot establish municipal liability and therefore the district court properly dismissed the claims against the City. However, I dissent from the majority's conclusions that the law was not clearly established at the time Mish sent the emails and that Mish's emails failed to meet the threshold required to constitute outrageous conduct.

## A. First Amendment Retaliation

At the motion to dismiss stage, it is at least plausible that Mish was acting as City Attorney when she sent the emails from her official email account. One of her explicit duties was to litigate cases on behalf of the city. (Dkt. 9-3 at Page ID 87–88). Therefore, an "apparent duty of [Mish's] job" would be to support any of the City's litigation strategies when criticized. *See Waters v. City of Morristown, TN*, 242 F.3d 353, 359 (6th Cir. 2001). Further, an attorney often represents her client's view of a litigation matter to persons or entities other than the court. Here, Mish did not communicate her view of a case to a colleague, for example, but rather to a private attorney and community activist whom she knew communicated with the press. Finally, Mish was the lead counsel for the department handling the EH litigation. A government-employed lawyer making extrajudicial statements about her client's pending litigation is acting in connection with the authority of her office. *See Filarsky v. Delia*, 566 U.S. 377, 383 (2012) ("Anyone whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983.") (citing *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982)). Therefore, the district court erred in finding Mish was not acting under color of state law.

The Hiltons' complaint alleges two First Amendment retaliation claims under 42 U.S.C. § 1983. The first count alleges that Mish sent a defamatory email, in her official capacity as Grand Rapids's attorney, in retaliation for plaintiffs' lawsuit against the city and its

police department. The second count alleges that Mish sent her email in retaliation for Elise Hilton's advocacy on behalf of, and association with, her employer, a non-profit think tank that was engaged in a tax dispute with the city at the time the email was sent. To sufficiently state a retaliation claim, the Hiltons must allege: (1) they engaged in constitutionally protected conduct; (2) the defendant took an adverse action that would likely deter a person of ordinary firmness from continuing to engage in the protected conduct; and (3) the adverse action was motivated at least in part by the Hiltons' protected conduct. *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998).

The Hiltons engaged in constitutionally protected conduct in filing their action against Hope Academy and the GRPD. *See California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("Certainly the right to petition extends to all departments of the Government. The right of access to the courts is indeed but one aspect of the right of petition."); *see also Smith v. Arkansas State Highway Emp. Local 1315*, 441 U.S. 463, 464 ("The First Amendment protects the right of an individual to speak freely, to advocate ideas, to associate with others, and to petition his government for redress of grievances.").

Mish took an adverse action by writing and sending the emails, and such actions would likely deter a person of ordinary firmness from continuing to engage in the protected conduct. *Bloch*, 156 F.3d at 678. The Hiltons explain:

> Would a citizen still choose to associate with Acton if they knew that, in response for doing so, the City Attorney would release information about their daughter's rape investigation? Would she still choose to file a lawsuit if she knew that in response the City Attorney would contact private individuals and claim, falsely, that their daughter was a "crack and heroin whore?" Would she still speak about the dangers of sex trafficking if she knew the City Attorney would state, in a publicly available document, that their daughter was "on an escapade trading sex for drugs?" The answer is a resounding no.

(Appellants' Br. at 32–33).

- 13 -

Although the district court never addressed Mish's motivation to send the emails, it is plausible that Mish was "motivated at least in part" by Elise Hilton's association with Acton and the Hiltons' suit against GRPD. Mish both refers to the Acton property tax dispute and describes the events underlying the Hiltons' suit against GRPD in great detail. (Dkt. 11-1 at Page ID 449) ("Perhaps you should ask the Acton Institute why they think they should be exempt from paying real property taxes? And why they are suing the City of Grand Rapids to demand their valuable government handout of that real property tax exemption?"); (*Id.* at Page ID 450) ("Ms. Elise Hilton the Acton hypocrite dares to sue the City of Grand Rapids . . .").

The Hiltons sufficiently stated a claim against Mish for First Amendment retaliation.

### B.  Qualified Immunity

To overcome Mish's defense of qualified immunity, the Hiltons must show that her alleged conduct "violate[d] clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Distinguishing the cases relied on by the Hiltons, the majority concludes that "none of our precedents clearly established" a violation of the Hilton's constitutional rights. I disagree.

In *Fritz v. Charter Township of Comstock*, 592 F.3d 718 (6th Cir. 2010), the plaintiff opposed the Township's actions by attending public meetings and voicing her concern about what she believed were procedural errors. *Id.* at 720. After this opposition, the Township Supervisor made statements about the plaintiff to her employer, including mildly or potentially defamatory ones about her standing in the community, and encouraged her employer to terminate her employment as an independent insurance agent. *Id.* at 725.

The majority observes that *Fritz* does not stand for the proposition that defamatory statements are per se sufficient to establish an adverse action. Maj. op. at p. 7. This is correct.

However, *Fritz* makes clear that statements by a public official, defamatory or not, may be an adverse action depending on their nature. The court in *Fritz* simply found that any defamation that occurred under those facts was "not of such a character" as to itself be an adverse action. *See* 592 F.3d at 727 ("The kinds of statements—both defamatory and not—that have been interpreted as adverse actions for the purposes of a retaliation claim are of a fundamentally different character than Plaintiff's allegations that Defendant Hudson falsely stated that she was violating ordinances and that there was a petition against her in the neighborhood."). The court noted the type of statements that are objectionable and potentially actionable are generally "highly embarrassing" and/or "impugn Plaintiff's character." *Id.* (citing *Bloch*, 156 F.3d at 679–81).

Here, Mish's statements were highly embarrassing and impugn both EH's character and that of her parents. The Hiltons thus allege a constitutional violation that is clearly established by *Fritz*.

In *Barrett v. Harrington*, 130 F.3d 246 (6th Cir. 1997), the plaintiff alleged that a state-court judge retaliated against him for investigating the judge. Specifically, the defendant judge told two reporters that the plaintiff was stalking her. *Id.* at 262. The court found the defendant judge was not entitled to qualified immunity: "Harrington's statements to the press fail the objective legal reasonableness test because her conduct violated clearly established First Amendment rights of which a person in her position would have been cognizant." *Id.* at 264.

The majority emphasizes that Mish's emails were only sent to a private individual, while the defendant judge spoke to a reporter. Maj. op. at p. 7. However, although the defendant judge likely assumed that her comments would be disseminated to others through the two reporters she spoke to, Mish should have assumed the same when she sent her email to a local attorney and

community activist, whom she knew kept in contact with the press. In fact, the Hiltons allege Zerial forwarded the communication to the press the same day he received it.

Further, although the actions of third parties can influence damages attributable to tortious conduct (i.e., A makes a defamatory comment to B, B disseminates broadly), it does not follow that third-party exacerbation of the damage is an element of the tort itself. In other words, Mish made a defamatory statement to Zerial and that was the constitutional tort: it is irrelevant to liability if Zerial caused more damage to the Hiltons by disseminating the statement or influencing the press to widely disseminate it.

Finally, in *Bloch*, a sheriff embarrassed a rape victim who was critical of him by releasing embarrassing details about her assault at a press conference. This court held that the plaintiff adequately alleged an adverse action because the sheriff's right to respond to criticism did not extend to the release of irrelevant, humiliating, and confidential information. 156 F.3d at 681. As in *Barrett*, that the sheriff released information to the press was not crucial to the court's ruling; it was dissemination to a third party for the purpose of embarrassing or humiliating the person who had criticized him. *See id.* at 683 ("[Defendant] clearly had a right to respond to [plaintiffs'] criticism, but if the [plaintiffs] can prove that the intimate details of the rape were released in order to retaliate against their criticism, a reasonable officer should have known that the action violated the [plaintiffs'] rights and therefore cannot benefit from the doctrine of qualified immunity.").

Moreover, in *Bloch*, the defendant's disclosure was of truthful information, but this court held that it could be retaliatory if intended to embarrass plaintiffs. *Id.* at 683. Here, the Hiltons

allege that not only did Mish release information about a rape victim, but that she released incendiary, accusative information that she knew, or should have known, was false.[1]

Under *Fritz*, *Barrett*, and *Bloch*, Mish's emails constitute an adverse action under clearly established law. She is therefore not entitled to qualified immunity.

### C. Intentional Infliction of Emotional Distress

As the majority concedes, the question whether a person's conduct was extreme and outrageous "should be presented to the jury if reasonable minds may differ regarding whether the conduct was, indeed, extreme and outrageous." *Burke v. Detroit Pub. Sch.,* No. 262983, 2006 WL 1156366, at *12 (Mich. Ct. App. May 2, 2006). The majority finds Mish's emails "shameful and inappropriate," but nonactionable because "they were only intended to be seen by a single unrelated third party through a private email, and the Hiltons only became aware of the statements by chance roughly a year after they were made." Maj. op. at p. 10.

I disagree. Mish was a senior public official responsible for representing the city, who allegedly had access to a fifteen-year-old rape victim's investigative and medical reports. She then sent a message to a member of the public falsely accusing[2] the minor victim of having engaged in promiscuous and criminal conduct, suggesting that her parents were at fault, and

---

[1] The Hiltons allege that Mish had access to the investigation records both generally in her capacity as City Attorney and specifically given that the records were part of pending litigation against the city and thus knew, or had reason to know, that EH was below the age of consent and thus could not have consented to sexual activity. (Dkt. 1 at Page ID 1–16). Further, the investigation records show that Mish's allegations about EH were untrue because EH was taken to a YWCA for a rape kit and toxicology screen, and she later went to a hospital. (*Id.*). The toxicology screen was negative (e.g., she tested negative for heroin and cocaine). (*Id.*).

[2] *Cf.* Mich. Comp. Laws Ann. § 600.2911(1) ("Words imputing a lack of chastity to any female or male are actionable in themselves and subject the person who uttered or published them to a civil action for the slander in the same manner as the uttering or publishing of words imputing the commission of a criminal offense.").

recommending that the recipient reconsider his relationship with the victim's mother (or her employer). By contemporary standards, such an email would be regarded by most as shocking and indecent. Assuming the truth of the factual allegations in plaintiffs' complaint, reasonable jurors could find that "the conduct was, indeed, extreme and outrageous."

Therefore, the Hiltons have stated a claim against Mish for intentional infliction of emotional distress.