# STATE OF MICHIGAN

# COURT OF APPEALS

TOBY O'BRIEN,

Plaintiff-Appellant,

v

CITY OF DETROIT, STEVE JOHNSON, and
CARNAGIE BURNSIDE,

Defendants-Appellees.

UNPUBLISHED
June 12, 2018

No. 337108
Wayne Circuit Court
LC No. 15-016044-CD

Before: BOONSTRA, P.J., and BECKERING and RONAYNE KRAUSE, JJ.

PER CURIAM.

Plaintiff appeals by right the trial court's grant of summary disposition in favor of defendants. Plaintiff is an experienced fire fighter in the City of Detroit who had received a probationary promotion to the rank of lieutenant and the position of an instructor at the fire department's training academy. Plaintiff ultimately failed his probation. He filed the instant action claiming that he was removed from the academy and returned to firefighting under the auspices of "lack of progress as a classroom instructor," when in reality, his probationary promotion was revoked due to a campaign of harassment directed at him by defendant Carnagie Burnside because he has dyslexia. Plaintiff also claimed that Burnside, a captain at the time, was protected at least in part by institutional racism practiced by the predominantly African-American staff, as plaintiff is Caucasian. There appears to be little dispute that Burnside's behavior when interacting with plaintiff was improper, or that the training academy suffered from some institutional dysfunctionality. The trial court, however, found no evidence that plaintiff was targeted and removed from the academy because of either his dyslexia or his race, and it held that plaintiff did not establish a genuine issue of material fact with respect to his intentional tort claims. We affirm.

Plaintiff joined the Detroit Fire Department in 2000 or 2001, was injured on the job in 2011, and returned to work in 2013, at which time he was directed to the training academy, where he was assigned to participate in some aspect of orienting or registering new cadets. On

-1-

April 28, 2014, defendant Steven Johnson, who was then "Chief of Training," ordered[1] plaintiff to read materials to the cadets. Plaintiff refused to do so, and explained that he has dyslexia, which Johnson accepted as a valid basis for the refusal to read aloud. Lt. Edwards overheard the conversation and shared the information with Burnside. Plaintiff received his probationary promotion to lieutenant on June 2, 2014. On June 17, 2014, a staff meeting took place. Plaintiff contends that "Captain Burnside disclosed to the entire training academy staff that [plaintiff] was dyslexic."

Whether Burnside "disclosed" plaintiff's dyslexia at the staff meeting appears to be a matter of perception. According to an "unauthorized" transcription of a recording of the meeting provided by plaintiff, which is generally reflective of what various witnesses described, Burnside was speaking to the entire staff and then addressed plaintiff as follows:

Um, we are going to have to and I know that, uh, the chief probably don't want me to bring this up but we need to, uh, um, bring up the point about we had the, um, orientation and the problems you said you had, we need to look into that problem. If you still have it or if that was just

*(orientation?)*

a joke, yes and we needed you to read a few things and you told us that you were…

*(O'Brien said, "oh, dyslexic?")*

yes

*(O'Brien said, "oh no, that's not a joke")*

It's not?

*(O'Brien said, "no")*

Okay, so we need to look into that, if that is going to be a problem what we need to do to help you out with that because what I need to do is, eventually you are going to be an instructor and we work you up to getting to that point where you are an instructor and we will help you out but sometimes, sometimes you're going to have to be in that classroom by yourself, so you need to start working on that fact itself. I see you got a little smirk on your face so I, I'm kinda being serious about it because that is something that is going to hinder us … and the other thing that I wanted to get to is, uh, yesterday we let help, i [sic] mean, we let you do the PT … well, the PT has to go through captain Green. He is the person who is going to be in charge of PT

*(ok, I understand)*

---

[1] Multiple witnesses, including plaintiff, testified to the general effect that the fire department was effectively run as a paramilitary organization, and that a request from a superior was indistinguishable from and constituted an order.

and, and right now, none of us have a specific job but your, the two of you, your specific job is learn instructing.

At that point, Captain Green, who was present at the meeting, left to notify Johnson about Burnside's commentary. The next day, plaintiff was summoned to a meeting with Johnson, who apologized to plaintiff, asserted that the department was not supposed to operate like that, and summoned Burnside to apologize. Burnside, however, believed he had nothing for which to apologize, and he became verbally hostile and abusive, eventually requiring him to be escorted off the premises. Johnson asked plaintiff if plaintiff needed any accommodations, which plaintiff declined.

The evidence suggests that Burnside had a general habit of demeaning others, but he usually managed to evade serious consequences. Nonetheless, Johnson immediately suspended Burnside for his unruly conduct when asked to apologize to plaintiff. However, his suspension was not permanent. Plaintiff testified at his deposition that Burnside initially returned to the academy for one day, on July 9, and Johnson ordered Burnside to remain on the second floor only. However, Johnson ordered Burnside back out of the building when plaintiff expressed the view that he was still uncomfortable. Burnside returned fully by July 23, 2014. The next day, a staff meeting was held, at which Johnson advised the staff that he would be absent on the 28th and that Burnside would be in charge in his absence. Johnson did not recall the meeting specifically, but he noted that it was standard procedure that Burnside, as the senior captain, would by definition be in charge of the building when Johnson was away. On July 25, Burnside came into one of plaintiff's classrooms and yelled at the cadets, although not at plaintiff. Johnson agreed that Burnside violated a direct order by doing so. On July 28 or 29, plaintiff advised Johnson that he would not set foot in the building if Burnside was present, and in fact, he never did return to the building. Johnson took this as plaintiff aborting his probation, and on the basis of plaintiff's evaluations as of that date, he determined that plaintiff had failed. Plaintiff was sent back to firefighting.

Plaintiff initiated complaints with defendant City's human rights department, the EEOC, and his union. The human rights department eventually determined that although Burnside's "behavior was very inappropriate and unprofessional, it did not rise to the level of workplace violence," and that plaintiff's discrimination complaints could not be substantiated. The union likewise declined to take action on plaintiff's behalf. Plaintiff contends that the EEOC eventually "recommended that [plaintiff] be returned to the Training Academy; however, no settlement was ever reached in the matter."

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). When reviewing a motion under MCR 2.116(C)(10), which tests the factual sufficiency of the complaint, this Court considers all evidence submitted by the parties in the light most favorable to the non-moving party and grants summary disposition only where the evidence fails to establish a genuine issue regarding any material fact. *Id*. at 120. Under MCR 2.116(C)(7), where the claim is allegedly barred, the trial court must accept as true the contents of the complaint, unless they are contradicted by documentary evidence submitted by the moving party. *Id*. at 119.

Plaintiff first argues that the trial court erred in concluding that his claim under the Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq.* (PWDCRA), fails because his disability was related to his ability to perform his job as an instructor. Under the PWDCRA, a protected disability is, in general, a real or perceived "determinable physical or mental characteristic of an individual" that "substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position." *Peden v City of Detroit*, 470 Mich 195, 204; 680 NW2d 857 (2004). Defendants contend that dyslexia is not a disability; yet in their own discussion, they tacitly concede that it *could* be a disability under some circumstances. It is reasonable to conclude that reading and writing is a major life activity. And there is no dispute that dyslexia interferes with an affected individual's ability to read and write. We render no opinion about whether dyslexia is a disability in the abstract, as there are various degrees of severity, but we conclude that under proper circumstances, dyslexia should be considered a disability under the PWDCRA.

Defendants contend that because nobody knew plaintiff was disabled until he told Johnson about his dyslexia and he refused accommodations, he is not sufficiently affected to be considered "disabled." We disagree. The PWDCRA explicitly includes "being regarded as having" a disability within its ambit. MCL 37.1103(d)(iii). "Normally, a *perceived* disability will be one that pertains to a disability with some kind of unusual stigma attached, often a mental disability, where negative perceptions are more likely to influence the actions of an employer." *Chiles v Machine Shop, Inc*, 238 Mich App 462, 475; 606 NW2d 398 (1999). Plaintiff's claims are at least partly premised on being harmed by the perception of being disabled by dyslexia. The PWDCRA is clearly intended to address prejudices arising out of any negative stigma plaintiff suffered as a result of being regarded as having dyslexia, whether or not the perception was accurate. At least for purposes of summary disposition, we accept that plaintiff has established a prima facie case of being "disabled."

As for whether plaintiff's dyslexia is "unrelated to [his] ability to perform the duties of" being a training instructor at the firefighters academy, plaintiff has created a genuine issue of material fact. In relevant part, being "unrelated to the individual's ability" means that "with or without accommodation, an individual's disability does not prevent the individual from . . . performing the duties of a particular job or position." MCL 37.1103(*l*)(i). Johnson testified that reading to students from written materials in class was, in fact, an important aspect of teaching at the academy. The list of job duties prepared by defendant City, however, does not on its face mandate reading aloud from written materials. The parties agree that the City's written job description constitutes primary evidence of the nature of those essential duties. See *Brickers v Cleveland Bd of Ed*, 145 F3d 846, 849 (CA 6, 1998). Therefore, whether plaintiff's ability to read aloud related to his ability to perform the essential duties of the job of lieutenant instructor remains a question of fact for the jury.

However, a prima facie claim for a hostile work environment requires an employee to "show that but for the fact of his membership in a protected class, he would not have been the object of harassment and that he was subjected to unwelcome conduct." *Downey v Charlevoix Co Bd of Comm'rs*, 227 Mich App 621, 630; 576 NW2d 712 (1998). A claim of discrimination on the basis of membership in a protected class requires evidence that the discrimination was *because of* membership in that protected class. *Id*. at 632-633. Under the PWDCRA, an adverse

-4-

employment action must be made *because of* a protected disability. *Peden*, 470 Mich at 203-204.

In the instant matter, we cannot find any fault in Johnson, a superior officer, requiring a junior officer to substantiate his explanation for refusing to obey a direct order, at least where, as here, plaintiff's reason for doing so had not already been communicated. Thus, contrary to plaintiff's contention, Johnson's asking plaintiff for verification of his dyslexia does not support a finding that Johnson was discriminating against plaintiff based on his having dyslexia. As for Burnside, we agree that his decision to raise plaintiff's reading "problem" in front of the entire training academy staff was insensitive and unprofessional. Although it did not technically force plaintiff to disclose his dyslexia, and was not itself a full disclosure of the dyslexia, it did place plaintiff on the spot, as it was obvious what Burnside was referring to in his remarks. Nevertheless, we find nothing intrinsically improper about Burnside, as another superior officer, also expressing concern about a refusal to obey an order, or in wishing to rectify a possible hindrance to teaching at the academy. Furthermore, plaintiff's dyslexia was already known to others[2] at that point, as revealed by plaintiff himself. Burnside's volatile reaction upon being asked to apologize amounts to nothing more than a grossly inappropriate refusal to admit that he had acted improperly or with insensitivity. His conduct was not directed at plaintiff's dyslexia, it was directed at the need to apologize for embarrassing plaintiff. There is no support for a finding that Burnside's return to work after a temporary suspension, despite plaintiff's refusal to be in the same building with him, was due to any animus or discrimination against plaintiff for having dyslexia. Instead, it is reflective of a department policy or culture that favored superiors over inferiors when a conflict between the two arose.

For better or for worse, employers are permitted to make foolish or self-destructive decisions or policies. *Peden*, 470 Mich at 218; *Town v Michigan Bell Tel Co*, 455 Mich 688, 703–707; 568 NW2d 64 (1997); *Debs v Northeastern Illinois Univ*, 153 F 3d 390, 396 (CA 7, 1998). Plaintiff has not provided any evidence tending to show that he suffered any adverse action *motivated by discriminatory animus toward his dyslexia*, even if his dyslexia happened to be the trigger for a cascade of other poor management decisions. "Speculation and conjecture are insufficient to create an issue of material fact." *Ghaffari v Turner Constr Co*, 268 Mich App 460, 464; 708 NW2d 448 (2005). Plaintiff has therefore not made out a prima facie case of discrimination under the PWDCRA.

Plaintiff also argues that the trial court erred in dismissing his retaliation claim, as he claims that Johnson failed his probation in retaliation for reporting Burnside's "illegal" behavior. Defendants note that Johnson had ordered plaintiff returned to firefighting prior to plaintiff's complaints, but his final evaluation was made approximately a month after the complaints. We reject defendants' contention that this temporal gap necessarily precludes any possible retaliation. However, the evidence establishes that Johnson had little choice in the matter; Burnside had completed his suspension and returned to work, while plaintiff refused to set foot

---

[2] Lt. Edwards, the party responsible for spreading knowledge of plaintiff's dyslexia after overhearing plaintiff's explanation to Johnson, is not a named party.

in the building with Burnside present. Consequently, it was not possible for plaintiff to continue his training as a probationary lieutenant instructor. Johnson testified that he believed plaintiff had exceeded his six-month probationary period, after which he would have to be either approved or disapproved. The evidence does not support this belief; however, Johnson also testified that plaintiff would not return to complete his probation, and he construed plaintiff's refusal to return to the building as a relinquishment of his probation. The law generally does not require individuals to engage in clearly futile actions. We conclude that defendants have articulated a valid, non-retaliatory basis for the adverse employment action: Johnson reasonably concluded that plaintiff's probation must be evaluated on the basis of the data then available.

We find nothing in the record to establish that Johnson, who had the sole discretion whether to pass or fail plaintiff, engaged in retaliation. The only argument plaintiff offers in support of his contention is that he did not receive any indication in his reviews prior to being returned to firefighting that he was failing. Plaintiff overstates the positive nature of his evaluations. Although he accurately points out that he was well-liked by the students—in dramatic contrast to Burnside—being liked by students does not necessarily reflect on the *effectiveness* of a teacher. The evaluations clearly showed that plaintiff was not yet ready to be a full instructor. Because he refused to enter the building and continue his training, he remained unready to be an instructor. While plaintiff may have a good argument that Burnside should have been removed as an instructor due to his irascible personality, there is no indication that the failure to accommodate plaintiff's refusal to enter the building with Burnside there was motivated by a desire for retaliation.

Plaintiff next argues that the trial court improperly found the individual defendants to be immune from tort liability under the Governmental Tort Liability Act (GTLA), MCL 691.1401 *et seq*. Individual lower-level public employees are subject to liability for intentional torts pursuant to the common law as it existed before July 7, 1986, and thus evaluated pursuant to the test outlined in *Ross v Consumers Power Co (On Rehearing)*, 420 Mich 567; 363 NW2d 641 (1984). *Odom v Wayne Co*, 482 Mich 459, 472-476; 760 NW2d 217 (2008). Thus, "employees enjoy a qualified right to immunity if (1) the employee's challenged acts were undertaken during the course of employment and the employee was acting, or reasonably believed he or she was acting, within the scope of his or her authority, (2) the acts were undertaken in good faith, or were not undertaken with malice, and (3) the acts were discretionary, rather than ministerial, in nature." *Oliver v Smith*, 290 Mich App 678, 688; 810 NW2d 57 (2010). Plaintiff concedes the first and third prongs of this test, but argues that the complained-of acts by the individual defendants could not have been undertaken in good faith.

As noted, it was reasonable for plaintiff's superior officers to be concerned about the legitimacy of his refusal to obey a direct order, to request some objective verification of his stated reason for doing so, and to address whether there was a need to accommodate a potential hurdle facing plaintiff when teaching at the academy. Although Johnson's record keeping may have been inaccurate, as alleged by plaintiff, Johnson has established his actions in handling a difficult work situation were taken in good faith and without malice. Meanwhile, although Burnside's inquiry into plaintiff's reading problem in front of others was insensitive and unprofessional, there is no evidence to support a finding that he was motivated by malice, rather than legitimately raising an issue of concern when it came to plaintiff's training to become an instructor. It was not until Burnside was asked to apologize that his conduct degenerated into

defensive self-righteousness and vociferous refusal. As discussed above, Johnson appears to have had no practical choices when dealing with resolving the conflict between plaintiff and Burnside. The evidence does not support a finding of malice motivating either Burnside's inquiry or Johnson's management of the ensuing dispute.

Plaintiff's intentional tort claims were also properly dismissed. Intentional infliction of emotional distress (IIED) requires conduct going beyond "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities," even if the actor "has acted with an intent that is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." *Graham v Ford*, 237 Mich App 670, 674; 604 NW2d 713 (1999). IIED is not actionable merely because a plaintiff's feelings were hurt or a defendant engaged in some misconduct, but rather the conduct "'may fairly be characterized as "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 608; 374 NW2d 905 (1985), quoting Restatement Torts 2d, § 46, comment d, p 73. Whether particular conduct *could* be construed as sufficiently extreme and outrageous is initially a question for the courts, and if so, it is for the trier of fact to evaluate whether the conduct actually was sufficiently extreme and outrageous. *Doe v Mills*, 212 Mich App 73, 92; 536 NW2d 824 (1995).

As discussed, Burnside's public handling of his inquiry into plaintiff's "problem" was inappropriate, especially for a supervisor, but it was not devoid of any justification, and it was not so extreme and outrageous as to go beyond all possible bounds of decency. Likewise, plaintiff has not presented evidence to establish that Johnson, in attempting to resolve the ensuing conflict between plaintiff and Burnside, engaged in conduct arising to such an extreme level that it could be regarded as atrocious and utterly intolerable in a civilized community.

The only conduct that could potentially constitute IIED is the alleged campaign of harassment plaintiff claims Burnside waged against him behind his back after Burnside was asked to apologize for embarrassing plaintiff at the June 17, 2014 staff meeting. Plaintiff admitted that Burnside never threatened him physically, and he only heard hearsay from the EEOC investigator to the effect that Burnside had disparaged him in front of the cadets. Our review of the EEOC investigation notes reveals that the interviewees all had a generally low opinion of Burnside and a significantly higher opinion of plaintiff, suggesting that the few instances of disparagement reported was not taken seriously. It appears that Burnside was in the habit of abusing the cadets generally, not just plaintiff's cadets, and when he yelled at plaintiff's class, he did not yell at plaintiff himself. Plaintiff makes some reference to Burnside ordering him not to contact cadets, but this apparently occurred on one occasion as part of his outburst in Johnson's office when asked to apologize. Given Burnside's immediate suspension and escort from the premises, Burnside had little opportunity to harass plaintiff. Burnside's conduct was improper, however we are not persuaded that it rises to the level of "extreme and outrageous," as necessary for a claim of IIED.

We also conclude that plaintiff failed to establish a viable claim of invasion of privacy against Burnside. Invasion of privacy requires the information disclosed to be highly offensive to a reasonable person, of no concern to the public, and not "already of public record or

otherwise open to the public." *Doe*, 212 Mich App at 80-82. Whether the information is offensive is a matter for the trier of fact, *id*. at 81, and giving plaintiff the benefit of the doubt, plaintiff expresses reasonable concern about how he might be treated on the basis of making his dyslexia public knowledge. Furthermore, one's medical details are considered inherently private matters. *Id*. at 82-83. However, plaintiff has not established that it was of no concern to the public or not already known to the public under the circumstances. It was arguably of a matter public concern at the teaching academy because it had already affected plaintiff's ability to participate in the orienting and registering of new cadets, and the instructors would need to assess whether and how any accommodations might be necessary when plaintiff engaged in teaching. Moreover, it is not apparent from the record that plaintiff expected to keep his dyslexia a private matter, as plaintiff told Johnson, and he said it loud enough to be overheard by Lt. Edwards. While it is undisputed that Burnside's specific manner of inquiring of plaintiff about his dyslexia at a meeting in front of the entire academy staff was unprofessional, plaintiff has not established a prima facie case for invasion of privacy.

Affirmed.

/s/ Mark T. Boonstra
/s/ Jane M. Beckering
/s/ Amy Ronayne Krause